IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 9, 2008

## MARVIN CATRON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25666     John T. Fowlkes, Jr., Judge**

**No. W2007-02408-CCA-R3-PC  - Filed October 6, 2008**

The petitioner, Marvin Catron, pled guilty to eighteen various felony charges in exchange for a sentence of fifty years served at 100%. Thereafter, the petitioner filed for post-conviction relief, alleging that his trial counsel was ineffective. After an evidentiary hearing, the post-conviction court denied his petition, and we affirm that judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Marvin Catron.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On September 21, 2000, the petitioner pled guilty to three counts of attempted first degree murder, two counts of especially aggravated robbery, nine counts of aggravated robbery, one count of attempted aggravated robbery, one count of especially aggravated kidnapping, and two counts of aggravated assault.[1] At the plea hearing, the State summarized the nine separate factual situations giving rise to the petitioner's pleas as follows:

> [O]n Friday, June 4, 1999, about 11:20 p.m., Willie Shivers stopped at the stop sign
> at William Fields, at Cleveland, in Memphis Shelby County. Two males, armed with

---

[1]Some of the indictments and judgment sheets are not included in the appellate record; therefore, we rely to some extent on information contained in the transcript of the guilty plea hearing.

handguns, approached Mr. Shivers['] 1983 Chevrolet S-10 pick-up, one from the driver's side and one from the passenger's side. The males made Mr. Shivers move to the center of the front seat and drove him off. Mr. Shivers was driven to the 1100 block of Agnus. The male that drove told the male that rode on the passenger side to shoot Mr. Shivers if he did not cooperate. Mr. Shivers was forced to hand over his money and then to take his coveralls off, which the males took. The males fled in Mr. Shivers['] work truck, owned by Donald Mickens.

. . . .

[O]n Monday, June 7, 1999 about 5:00 o'clock p.m., Michael Bothne . . . was closing the business that he owned, Marrs Incorporated . . ., located at 1001 North Second Street, when he was approached by a male on the parking lot. The male asked Mr. Bothne for a drink of water inside the building, which Mr. Bothne refused. At this time the male displayed a silver handgun and order[ed] Mr. Bothne's wallet and money, ordered him to hand them over. After giving the male the wallet, money and keys, the male fired two shots. Mr. Bothne was struck once in the right side. . . .

. . . .

[O]n Friday, May 26, 1999 at about 8:20 p.m., Elona Sharbinae was attempting to enter the front door of her home, located at 1943 Lyndale. She was approached by a lone male, armed with a revolver. The male demanded Ms. Sharbinae's purse and she refused. A brief struggle ensued and the male quickly gained control of her purse. As the male turned to flee with her purse, he pointed his revolver in the direction of Ms. Sharbinae's head and fired a shot that struck the house. The male ran to an older model, dark colored car and fled.

. . . .

[O]n May 24, 1999 at about 9:50 p.m., Michael Lehr, . . . and his wife, Jenny Lehr, were getting out of their vehicle at 1947 Crump when they were approached in their driveway by a lone male. The male was armed with a handgun and demanded all their money. Lehr and his wife gave the male a purse and a wallet containing credit cards and cash. The male took the items and as he was leaving turned and fired one shot striking Ms. Lehr in the back.

. . . .

[O]n May 22nd, 1999 at about 11:00 p.m., Joseph Williams and Patrick Yoda were getting into their vehicle at 516 Stonewall when they were approached by a lone male, armed with a handgun. The male pointed the gun at Williams and Yoda and

demanded their wallets. Both victims gave the male their wallets, which contained $35.00 cash. . . .

. . . .

[O]n May 21st, 1999, at about 11:50 p.m., Everett Lafon, . . . was in his driveway, located at 762 Holly, when approached by a lone male armed with a handgun. The male put the gun to Lafon's head and demanded his money. Lafon gave the male a wallet containing $250.00 cash. . . .

. . . .

[O]n Friday, May 21st, 1999 at about 8:25 p.m. Sayward Ely, . . . was in her driveway located at 1970 Crump when she was approached by a lone male armed with a revolver. The male demanded Ms. Ely's purse as he cocked a gun. Ms. Ely told the male that she did not have a purse, and he grabbed a pair of shoes out of her hands and threw them to the ground. Ms. Ely state[d] that she heard a "click[,"] like the male pulled the trigger and the weapon did not fire. The male fled on foot and Ms. Ely ran into her house and told her mother, Alice Gibson[,] to call the police.

. . . .

[O]n May 21st, 1999, Leonetta Blackwell was attempting to go inside her house, located at 1047 North Avalon when she was approached by a lone male, armed with a handgun. The male demanded and took Blackwell's purse, which contained $20.00 cash. . . .

. . . .

[O]n May 21st, 1999 at about 9:00 o'clock p.m., Christian Denmon, . . . was getting out of the car at 475 North McNeal, when she was approached by a lone male armed with a handgun. The male demanded and took Denmon's purse and all of it[s] contents. He also pointed a handgun at Janet Williams and made her lay down during the robbery.

. . . .

[O]n May 18, 1999 at about 10:05 p.m. Tonya Campbell Mason was attempting to go inside her home at 933 North Willett, when she was approached by a lone male, armed with a gun. The male demanded and took Mason's purse, which contained $150.00 cash. . . .

The petitioner subsequently filed a timely *pro se* petition for post-conviction relief, and, following the appointment of counsel, an amended petition was filed. The post-conviction court conducted an evidentiary hearing on two dates, February 17, 2006, and April 6, 2006. At the hearing, the petitioner testified that he met with counsel approximately five times from the time she was appointed as his attorney in late June 1999 to the day he pled guilty in September 2000. The petitioner admitted that counsel provided him with discovery in all of his cases and discussed defenses with him. His main concern with counsel was that she did not investigate his drug addiction even though he had given her the names and addresses of people who could testify about his addiction. He acknowledged that counsel asked him questions about whether he had received formal drug treatment and occasionally took notes during their conversations, but he said that his meetings with counsel would last "[m]aybe about thirty minutes."

The petitioner recalled that one of his cases was originally set for trial the day he pled guilty, and counsel had not discussed any kind of strategy or the facts of the case with him. He did not remember whether counsel filed any motions to suppress but said she did go over what the State's proof would be at trial. The petitioner stated that he did not tell the court he was not ready to go to trial because "[i]t didn't seem like they [were] hearing it." The petitioner testified that he asked counsel about diminished capacity and getting witnesses to testify about his cocaine use, and she said "she would get around to it" and "she wanted to talk to the prosecutor."

The petitioner stated that before the trial was supposed to start, counsel talked to him about the State's offer and how much time he faced if he went to trial. He said that he initially told counsel that he did not think the State's offer was reasonable, but he later determined that he "didn't see [him]self winning." The petitioner elaborated that "it didn't look like my lawyer was fighting for me." The petitioner alleged that counsel did not properly investigate his case and that "there were people that I asked her to contact and they haven't seen her." At the hearing, the petitioner noted that Chris Valen and Robert Miller were two of the names he furnished to counsel. The petitioner said that he was on drugs, specifically Elavil, when he entered his guilty plea, but he did not inform the court. He said he obtained the drugs from other inmates.

On cross-examination, the petitioner admitted that he had discussed his first case with counsel; he just did not know it was the case that would be tried first. The petitioner said that, in addition to Valen and Miller, he had wanted counsel to call some members of his family at trial to testify about his drug problem. However, the petitioner acknowledged that he did not bring any of those witnesses to the post-conviction hearing but explained that he thought the hearing was scheduled another day. The petitioner admitted that on the day he pled guilty, his case was not actually set to go to trial as he had alleged earlier. Instead, it was the date set for him to decide whether he wanted to plead guilty or set a trial date. The petitioner also acknowledged that he ultimately decided not to go to trial because several of the victims had identified him from a photographic line-up, and he had made confessions regarding the offenses in several of the indictments. The petitioner said that he lied at the guilty plea hearing when he told the trial court that he did not have any complaints or problems with counsel's representation. On redirect examination, the petitioner explained that he lied because "[a]t that time I had basically given up."

Counsel testified that she represented the petitioner from June 28, 1999, until the day he pled guilty, September 21, 2000. Counsel said that she had "numerous opportunities to talk with [the petitioner]." Counsel visited the petitioner in jail six times and several other times in court. Counsel discussed the petitioner's cases with him, and he admitted that he committed the offenses "because he had a drug habit and was trying to support that drug habit." Counsel stated that she was provided with discovery from the State, which she discussed with the petitioner. Counsel recalled that they discussed the petitioner's drug habit, and she explained to him the requirements of a voluntary intoxication defense. Counsel requested a mental evaluation of the petitioner which showed that the petitioner was "competent with no defense of insanity and that he wasn't committable."

Counsel stated that she discussed with the petitioner all the offers extended by the State, and in fact the petitioner made a counteroffer to the State. According to counsel, the petitioner never indicated that he wanted to go to trial but, instead, "always wanted to plead." Counsel said that it was not until the petitioner and the State could not agree on an offer that the petitioner said he "wanted to take it to trial." Counsel recalled that while the trial court was questioning the petitioner about setting the matter for trial, the petitioner said that he wanted to talk to counsel and asked her what he should do. Counsel told the petitioner that he had to be the one who made the decision, but she discussed that the offer was "almost a life sentence" or he could "get it in pieces at a trial." After another series of discussions with the State, the petitioner decided to accept an offer of fifty years served at 100%. Counsel remembered that they discussed filing a motion to suppress the petitioner's statements to the police but determined that "[they] had no basis to file a motion to suppress the statements."

On cross-examination, counsel stated that she had the petitioner mentally evaluated "because of the nature of the charges, because [they] were serious. . . . And we did discuss, whether or not, because of his drug problem if he remembered all of these incidents. And he did, he remembered them, very well." When asked if the petitioner ever provided her with the names or addresses of anyone who could corroborate that he had a serious drug problem, counsel said, "No. And, in fact, going over his testimony on the post-conviction hearing, the names that he gave during direct was the first time that I've ever heard those names." Counsel agreed that she had the petitioner evaluated to determine his mental capacity, not to check him for possible drug problems. Counsel considered the possibility that the petitioner was on drugs given he went on "a crime spree in a short period of time," but, after talking to him, she did not think she could sustain that position.

At the conclusion of the hearing, the post-conviction court entered a written order denying the petitioner post-conviction relief. The court concluded that the petitioner failed to prove his allegations by clear and convincing evidence, noting that the "[p]etitioner's true complaint is in the nature of buyer's remorse. He is unhappy because after having time to reflect upon the plea, he now complains that he entered into a bad deal."

## ANALYSIS

On appeal, the petitioner raises the sole issue that he was denied the effective assistance of counsel because counsel did not properly investigate his drug problem. The petitioner asserts that the nature and degree of his drug problem, once established, would have been relevant to his defense. He contends that a letter counsel received from a mental health center should have put her on notice that he could benefit from a drug rehabilitation program.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different"). "In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Initially, we note that the petitioner has arguably waived his ineffective assistance of counsel claim for failing to provide this court with an adequate argument in support of his claim. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). However, even if we do not consider his argument waived, the petitioner's claim still fails.

First, the petitioner's primary support for his ineffective assistance of counsel claim is a "letter of MMHI" that said he could benefit from a drug rehabilitation program. However, the letter he is referring to is actually a letter concerning one of counsel's other clients, not the petitioner. On page eighteen of the transcript of the April 6, 2006, post-conviction relief proceeding, the following exchange occurred:

[Appellate Counsel]: Okay. So are you saying, let me back up, when you had him examined in General Sessions, of course, you didn't put in the order to have him examined to check him for possible, you know, drug problems; is that correct?

[Trial Counsel]: Not that I recall.

[Appellate Counsel]: Just strictly for insanity, his mental capacity?

[Trial Counsel]: I'd have to look at the order, but probably so.

[Appellate Counsel]: But, general[ly] speaking though, would it be correct, though, that unless you put it in there they would not look for that particular type of problem, whether he might have some kind of drug problem?

[Trial Counsel]: I don't know. I just got a letter back this morning . . . from M.M.H.C., on a client who I did not ask him to be evaluated for a drug problem, but their response to me was that he was competent, no signs of insanity, not committable, but however, he could benefit from drug rehab.

So sometimes, Mid-town Mental Health Center does address those issues.

[The Court]: Yeah, they're good about that.

Consequently, a large portion of the argument the petitioner provided to this court is entirely irrelevant.

Second, the petitioner has failed to establish deficient performance on the part of counsel. He argues that counsel should have investigated the nature and degree of his drug problem in order to establish his defense. The record, however, shows that counsel performed "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel testified that she discussed the petitioner's drug habit with him and explained to him the requirements of a voluntary intoxication defense. Counsel stated that she did not think the petitioner could sustain a defense that he was on drugs at the time of the offenses because "he remembered all of these incidents. . . . he remembered them, very well." Counsel also stated that the petitioner never provided her with the names of witnesses who could testify about his drug problem. The post-conviction court implicitly accredited counsel's testimony when it concluded, immediately after discussing the petitioner's and counsel's contrary testimonies, "This Court finds

that counsel's conduct fell within the wide range of reasonable professional assistance and does not constitute ineffective assistance of counsel. The Petitioner has failed to prove his claim by clear and convincing evidence." The evidence does not preponderate against the post-conviction court's determination. See Wiley, 183 S.W.3d at 325.

Third, even if we assume counsel was deficient in her representation of the petitioner, the petitioner has failed to establish the prejudice prong of Strickland. He claims that he provided counsel with the names and addresses of people who could testify about his drug problem and that counsel never contacted those people. Yet, the petitioner did not produce these witnesses at the post-conviction relief hearing and therefore has failed to establish prejudice. See Denton, 945 S.W.2d at 802-03. We note that neither the post-conviction court nor this court may speculate on what a witness's testimony might have been if introduced by counsel. See Black, 794 S.W.2d at 757. In addition, the petitioner failed to establish prejudice in relation to his guilty pleas because he never even alleged that he would not have pled guilty but for counsel's deficient representation. See Hicks, 983 S.W.2d at 246.

Moreover, by the petitioner's own admission at the guilty plea hearing, he was satisfied with counsel's representation. During the plea hearing, the following colloquy took place between the trial court and the petitioner:

[The Court]: Any problem that you've had with [trial counsel] . . . that makes you want to enter a plea, instead of have a trial?

[The Petitioner]: No, sir.

[The Court]: Okay. You need to understand that you're under oath, sir, and the answers to the questions that you're being asked, subject to the penalty of aggravated perjury which carries two to twelve years in prison. If you have something against [trial counsel], if she didn't investigate the cases, or didn't talk to you, or visit you about these cases, or threatened you in any way, you need to tell me now, because if you later on, during this next year, file a post-conviction petition and say she did wrong things to you or lied to you, or threatened you, or anything like that, we need to hear that now, because if you file it later on, you could subject yourself to the penalty of perjury. If later on you signed something that's not true.

So I'm going to ask you now, do you have any complaints, at all, about [trial counsel] as your attorney?

[The Petitioner]: No, I don't.

[The Court]: Has she visited you enough, to your satisfaction, working on these cases?

[The Petitioner]: Yes, sir.

[The Court]: She has?

[The Petitioner]: Yes, sir.

[The Court]: Did she have these cases investigated?

[The Petitioner]: To my knowledge, yes, sir.

[The Court]: And did she talk to you about the results of that investigation?

[The Petitioner]: Yes, sir.

[The Court]: Do you have any complaints, at all?

[The Petitioner]: No, sir.

[The Court]: And are you entering this plea because you want to enter it, freely and voluntarily?

[The Petitioner]: Yes, sir.

## **CONCLUSION**

After review, we conclude that the petitioner has failed to prove, by clear and convincing evidence, either deficient performance on the part of counsel, or any resulting prejudice. Therefore, we affirm the post-conviction court's denial of post-conviction relief.

_____
ALAN E. GLENN, JUDGE